# Morris v. Morris

*Amy J. Miller*, for plaintiff.
*David S. Sobotka*, for defendant.

LASH, *J.*, January 10, 2014—The matters before this court are the petition of plaintiff, Lisa Ann Morris (hereinafter "mother"), for a modification of a custody order and the corresponding counterclaim filed by defendant, Arthur Layton Morris, Jr. (hereinafter "father").

Both parties are before this court seeking primary custody of their minor son and a modification of a custody order entered by this court by agreement on January 26, 2010. Trial was held on January 2, 2014. This court enters the following findings of fact:

## I. FINDINGS OF FACT

1. Plaintiff, Lisa Ann Morris (hereinafter "mother"), is an adult individual who currently resides at 202 Hopewell Street, Birdsboro, Berks County, Pennsylvania 19508.

2. Defendant, Arthur Layton Morris, Jr., (hereinafter "father"), is an adult individual who currently resides at 164 Icedale Road, Honeybrook, Chester County, Pennsylvania 19344.

3. The parties are the natural parents of a son, D.S.M., born November 11, 2004, (hereinafter "minor child").

4. The parties were formerly husband and wife, having been married on August 9, 2002. The parties separated on July 22, 2007, and were divorced on January 7, 2011.

5. Since the time of separation, mother has been the primary custodian of the minor child.

6. The custody action was initiated by mother through the divorce complaint filed in November of 2008. The parties subsequently filed a stipulation, which the court entered as an order on January 26, 2010. The order provided, among other things, that the parties would share legal custody of the minor child, that mother would have primary physical custody, and that father would have partial custody on alternating weekends from Fridays at 5:00 p.m. until Sundays at 8:30 p.m., and every Monday and Wednesday night from 5:00 p.m. until the following

4

Thursday morning at 9:00 a.m.

7. On or about July 23, 2012, father filed a petition to modify the custody order. However, on December 17, 2012, he filed a praecipe to withdraw the petition to modify, because he had decided to move to Florida for work-related reasons.

8. After residing in Florida for a short time, approximately a month, father returned to Pennsylvania. Concurrently, mother filed a petition to modify the custody order, on or about January 29, 2013. Father filed his counterclaim on April 16, 2013.

9. Mother currently resides with the minor child's maternal grandmother, Linda Finney, mother's 18 year old son, Brandon Davidheiser, and the minor child.

10. Father resides with his wife, Stacy, and her daughter, Isabella, age 11. Father has an 18 year old son, Jesse, and a 17 year old daughter, Andrea, who reside with their mother. Andrea is currently estranged from father.

11. Mother's home is located in an urban setting, while father resides in a more rural area. The minor child has his own bedroom in both houses. The minor child has pets in both households, a dog at father's and turtles at mother's. Both homes are environmentally suitable for rearing a minor child.

12. Mother resides in the Daniel Boone School District. Father resides in the Coatesville School District. The minor child attends Birdsboro Elementary Center in the Daniel Boone District and is in the third grade.

13. The minor child has had some difficulties in school,

particularly in reading. An Individualized Education Program (IEP) is now being administered to the minor child for the 2013-2014 school year.

14. Mother is employed as a customer service assistant at Polymeric Systems in Elverson, Pennsylvania. Her work hours are Monday through Friday from 9:00 a.m. to 5:00 p.m. She leaves for work approximately 7:30 a.m. and returns at about 5:30 p.m. The maternal grandmother cares for the minor child after mother leaves for work, ensuring that he gets on the school bus and is also available for him when he returns home on the bus from school.

15. Father is employed by the County of Chester as an information technician. His work hours are Monday through Friday from 8:00 a.m. to 4:30 p.m. On weekdays when he has the minor child overnights, father drops the minor child off at mother's home between 7:00 a.m. and 7:15 a.m.

16. Father provides all the transportation. The parties meet at a convenience store in Gibraltar, Pennsylvania, for the pick up and drop off.

17. An independent psychological evaluation was compiled by Matt Shollenberger, Ph.D., P.C. The evaluator conducted interviews, family genograms, and administered the Minnesota Multiphasic Personality Inventory-2 RF tests, two (2) parent relationship questionnaires, the Beck Depression Inventory, the Beck Anxiety Inventory, and the Michigan Alcohol Screening tests, and conducted home visits of the parties' residences. He compiled a written report dated June 24, 2013.

## II. DISCUSSION

6

In making disposition, this court considered the testimony of the parties, the maternal grandmother, Linda Finney, father's wife, Stacy, father's 17 year old daughter, Andrea Morris, the expert testimony of Dr. Shollenberger, an *in camera* conference with the minor child, and the exhibits of the parties.

The presentation of both parties emphasized the perceived negative attributes of the other party. There were few positive characteristics cited by one party in favor of the other. In speaking of themselves, both parties emphasized their desire for primary custody, their wish to spend as much time with the minor child as possible, and their belief of being better suited than the other to oversee the minor child's needs in education and health care. Both pointed out their recreational interactions with the minor child. Father's wife testified of bike rides, swimming, walking in parks, and movies. Mother similarly noted bicycling, hiking, spending time at Hopewell Lake, kite flying, going to the mall, and seeing movies.

Father's concerns were various and in some cases substantial. A problem in mother's household has been her relationship with William Quinley. Mr. Quinley was abusive to mother, including at least on one occasion in front of the minor child, with mother obtaining a protection from abuse order against him. The police had to be called to her home. On one occasion, he pointed a gun at father. He also threatened to come to father's employment while father was employed at Great Valley School District to settle some issues. Father reported this to the school administration, who viewed this as a risk and took necessary precautions, and was a factor in father's separating from his employment with Great Valley.

Mother testified that the relationship with Mr. Quinley ended approximately a year ago and that she has not had contact with him. Father suspects otherwise, particularly since Mr. Quinley contacted the evaluator in June 2013.

Father also outlined the difficulties he has with mother in co-parenting the minor child. Mother refuses to communicate with him. She refuses to allow him to pick the minor child up at her residence, which results in father having to drive an additional fifteen minutes one way to a convenience store in Gibraltar where the transfer takes place. On one occasion, mother struck father in the face, resulting in mother being charged with and found guilty of harassment before a magisterial district judge. When making the transfer, mother is sometimes hostile, including speaking loudly and making obscene gestures.

Father blames mother for the minor child's school problems. He points out that the minor child has had excessive absences, the implication being that mother does not force the minor child to go to school when he doesn't want to attend or feigns illness. The minor child's reading problems were, in part, exacerbated by his inadequate eyesight. Father took the necessary measures to address the problem, eventually resulting in the minor child receiving a prescription for eyeglasses. Father testified that mother denied that the minor child had a problem and was uncooperative. He also notes that once the minor child was fitted with eyeglasses, his production, as well as his demeanor, immediately improved at school.

While mother was not particularly interested in assisting in getting the minor child eyeglasses, she does oversee the minor child's doctor's visits. Due to father's

work schedule, and the fact that he does not have the minor child on weekdays, it is very difficult for father to schedule medical appointments, unless they are on the weekend. He has requested that mother schedule the appointments and notify him, but she refuses to communicate.

There were several issues with the cellphone that father brought for the minor child. Father claims that mother has blocked father from having cellphone access to the minor child, which mother denies. Father, who is an informational computer technician, entered applications on the minor child's cellphone, primarily to assist him with schooling, but also included Facebook. Mother objected to Facebook and some of the other applications. Additionally, the phone screen was broken and has not been fixed because father needs password information from mother in order to get the phone fixed. Although the phone still works, father is concerned that the minor child could injure himself on the jagged edge of the screen.

Father also believes that mother has made misrepresentations to the evaluator, resulting in the evaluator's recommendation being based on a faulty foundation. For example, the evaluator reported that mother told him that the minor child has been diagnosed with allergies when, in fact, this had not happened.

Mother has similar complaints against father. She agrees that there is a lack of communication, but states that this stems from father's continuing hostility toward her. He is condescending and authoritarian. For this reason, she does not want to have any verbal interaction with him and does not want him to come to her house, for she is concerned that he will act out in front of the neighbors.

Mother believes that the minor child's school issues stem from the custody schedule. Father has two (2) weekday evenings every week, returning the minor child the next day. This results in the minor child spending one (1) night at mother's home, then the next night at father's, and so forth. Further, father has to wake the minor child up very early when he has custody to get him to mother's house prior to her leaving for work. This causes the minor child to lose about one (1) hour of sleep. These issues have affected his ability to focus in school. Mother also claims that father does not place any emphasis on the importance of education. She stated that father doesn't help with homework and is not in contact with the school district. She points out that father's son, Jesse, now 18, dropped out of school and does not want the same thing for her son. Further, if father assumed primary custody of the minor child, the minor child would have to change school districts, which would also affect his ability to function.

Mother believes that father undermines her authority with the minor child. According to mother, father told the minor child that "you don't have to listen to her, she is not your boss." As a result, mother sometimes has difficulties keeping the minor child under control.

Mother believes that father has anti-social qualities. Not only is she unable to deal with him, he, apparently, is estranged from members of his family. More importantly, he has a difficult relationship with his son and daughter from his former wife. Father's daughter, Andrea, testified that she currently has no relationship with father.

Mother believes that father cannot provide a stable household. When he left Great Valley School District,

which was sometime in late November or December of 2012, Father abruptly chose to move to Florida to assume new employment. This only lasted for a month or so and father returned. His relationship with his current wife is of short duration. The couple experienced two periods of separation, one because they weren't getting along, with the second being the Florida move, although on that occasion the couple stated that they continued to maintain their relationship. Father has had several residences and several employments, and is now in his third marriage.

The evaluator, Dr. Shollenberger, recommended that mother continue as the primary custodian, with father to have partial custody during the school year. He recommends that the schedule be adjusted to eliminate overnight visits for father on weekdays during the school year. The parties would share custody equally during the summer on a week-on, week-off basis. He also recommended that the minor child have no exposure to William Quinley.

The evaluator believed that mother would be better suited for primary custody in part because of father's unstable personal history. He cited father's recent short term relocation to Florida, the newness of his marriage, and past changes in his residence and employment as evidence. He was also not impressed with father's stated basis for seeking primary custody, that it would enable father to "have more control." The evaluator's advocacy for removing father's overnight visits on weekdays during the school year reflected his concurrence with mother's belief that the constant moving back and forth from one household to the other, and having to get up early when at father's house to get to school on time, was a substantial contributor to the minor child's problems at school.

The evaluator also noted some additional concerns identified through the results of the MMPI-2-RF testing. Regarding father, the test revealed substantial interpersonal dysfunction, that father was "likely to have family conflicts and to experience poor family functioning, to have strong negative feelings about family members, and to blame family members for his difficulties." The behavioral dysfunction scale also raised issues, including identifying a propensity for criminal and antisocial behavior, conflictual interpersonal relationships, and difficulties with authority figures. There was also some dysfunction reported from mother's test results, namely, in the emotional dysfunction scale, where mother was "likely to be stress-reactive, worry prone and to engage in obsessive rumination," and on the interpersonal dysfunction scale where, like father, she is prone to family conflict and poor family functioning, strong negative feelings about family members, being prone to blame family members for her own problems. Dr. Shollenberger recommended that the parties attend co-parenting counseling and that mother engage in individual counseling.

At issue is primary physical custody. The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello*, 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton*, 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

In 23 Pa.C.S.A. Section 5328, the general assembly

has enumerated certain factors to consider when awarding custody, if relevant,[1] giving weighted consideration to those factors which affect the safety of the minor child.

The first issue concerns "which party is more likely to encourage and permit frequent and continuing contact between the child and another party." Neither party has been particularly cooperative with the other. It is apparent that mother does not want to have any dealings with father. This is evident by her refusal to communicate with him or to allow him to come to her house to pick up the minor child. Significantly, she made a comment that she had hoped that father would remain in Florida. Father also complained about his problems obtaining phone contact with the minor child due to mother's blocking access, but this appears to stem primarily from the parties' inability to agree on what application the minor child should be permitted to use. Father, as partial custodian, and based on the schedule, has not had the opportunity to establish what type of continuing contact he would allow mother, if he had the choice. That being said, his attitude toward mother is no better than her attitude toward him. This factor favors father but only slightly.

The next factor concerns the "present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child." There were no allegations of abuse raised against father or his household. Mother's household has some history of abuse

---

1. There is no evidence that either party or a member of the parties' household had any history of drug or alcohol abuse (factor 14). Accordingly, factor 14 was not considered in making disposition.

perpetrated by her former boyfriend, William Quinley. Mr. Quinley was abusive to mother, and this abuse was at least to some degree witnessed by the minor child. Mother adamantly states that she has no current involvement with Mr. Quinley, but assuming that is true, the existence of the relationship is still evidence of mother's poor judgment in selecting a partner to assist her in rearing her minor child. This factor favors father.

The next factor addresses "the parental duties performed by each party on behalf of the child." This factor favors mother. She has been the primary custodian and accordingly, the parent caring for the minor child on a daily basis, for over six and one-half (6 1/2) years. Father's involvement has been primarily limited to weekends. He has also been less active in medical and educational concerns which he blames on mother's refusal to cooperate. However, if his only obstacle was mother's recalcitrance, he could have requested relief from the court but, in fact, only approached the court approximately five (5) years after the parties first separated, when he filed a petition to modify.

The next factor concerns "the need for stability and continuity in the child's education, family life and community life." Mother and the minor child continue to reside in the former marital residence, the location where the minor child is comfortable and has made friends. Father has moved several times, including his move to Florida, and has had several different employers. Neither party has been able to establish and maintain a strong, stable interpersonal relationship, father being married three (3) times and mother being involved in several relationships, including the abusive one with William Quinley.

This factor favors mother. Father's abrupt move to Florida was significant and ill-advised, causing a geographic separation from his three (3) children and his wife. The fact that he quickly returned showed that he also realized the mistake. The move appeared to be a kneejerk reaction, with father failing to fully think through how this would affect his family. That being said, father is now residing with his wife in a home that was formerly owned by his wife's father, a location that should continue as his residence for as long as the couple remain married, which hopefully will be for a long time, but remains to be seen.

The next factor addresses "the availability of extended family." The maternal grandmother resides with mother in the former marital residence and is available to help care for the minor child. The minor child also interacts with other members of mother's family. Father has had some difficulty with members of his family, which impacts on the minor child's access to those family members. Father's lack of family contact implies that he does not consider family relationships important in the context of rearing a child. This factor favors mother.

The next factor reviews "the child's sibling relationships." The minor child has a good relationship with mother's other son, Brandon, and father's children. In fact, father's daughter, Andrea, has reached out to mother to enable her to continue contact with the minor child, even though she has no contact with father. Thus, most or all of the minor child's interaction with his siblings are through mother. This factor favors mother.

The next factor concerns "the well-reasoned preference of the child, based on the child's maturity and judgment."

This court conducted an *in camera* conference of the minor child with the attorneys present. The minor child was pleasant and cooperative throughout the interview. He was able to understand the questions and provide responsive answers. He was somewhat quiet, perhaps a little nervous, and was credible, although noncommittal on some issues. This court shall publish an addendum, available to counsel for the parties but not to the parties themselves, explaining the court's position on this factor.

The next factor addresses "the attempts of a parent to turn the child against the other parent." Although these parties do not get along, there does not appear to be any intent by either party to alienate the minor child from the other parent. Mother did complain about father's undermining her authority by telling the minor child that mother is "not his boss," but this appears to be more of a failure in co-parenting, not an attempt to alienate. This factor is not relevant to this case.

The next factor concerns "which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs." For reasons already set forth, mother is better able to provide stability and consistency in the relationship. Both parties love the minor child. It appears both parties have developed a close bond. This factor favors mother but only slightly.

The next factor addresses "which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child." From a positive standpoint, mother assumed the role of primary custodian and has never wavered in that commitment. That

being said, there have been some concerns about mother's attendance to the minor child's daily needs. Mother has been somewhat lax in requiring the minor child to attend school. It was father, not mother, who moved to have the minor child's vision corrected. Importantly, mother has been resistant to father being involved with the minor child's educational and medical issues. Mother's exposing the minor child to William Quinley may have impacted on him emotionally.

It is difficult to access father's capacity here, as father has not had the opportunity to show how he would address these concerns. That being said, however, the issues he had with his other two (2) children, including estrangement and his son dropping out of school, lends support to mother's conclusions that father would not be as invested as he would suggest in ensuring that the best interests of his minor child are met. This factor favors mother but only slightly.

The next factor reviews "the proximity of the residences of the parties." According to father, the residences are an approximate twenty (20) minute drive apart. Unfortunately, because mother will not allow father to come to her house, the actual drive for the minor child is thirty-five (35) minutes from the meeting place to father's home. Considering mother's concern that the minor child is getting up too early to return to her house in the morning and is having difficulty focusing in school, and as a practical matter, it would make more sense to reduce the driving time to the twenty (20) minutes between households. Another option would be to choose a new meeting place between the two (2) households.

A twenty (20) minute drive is common in custody cases and should not be a factor in making disposition. Accordingly, this court will order a change in the location of the transfer, but otherwise will not consider this as a relevant factor.

The next factor addresses "each party's availability to care for the child or ability to make appropriate child-care arrangements." Mother, with the duties of primary custody, has had no difficulty making suitable arrangements, utilizing the maternal grandmother, who resides with her, to assist the minor child with getting to school and otherwise caring for the minor child. Father did not provide any evidence on what his arrangements would be if he had primary custody. This factor favors mother.

The next factor is a review of "the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another." Unfortunately, these parties do not cooperate. The evaluator found that each had significant dysfunction in the area of interpersonal contact. It is ironic that two people who, apparently, have difficulty getting along with other people, would end up in a relationship. This court agrees with the evaluator that the parties should engage in co-parenting counseling. While this court is not optimistic that the parties will take an introspective look at themselves and make appropriate adjustments, the counseling may at least provide the parties with the knowledge on how their acrimony substantially affects the welfare of the minor child. Perhaps if they have this awareness, they will make a better effort to tolerate each other, even if they do not accept any responsibility for their actions. This factor does not favor either party.

The last relevant factor concerns "the mental and physical condition of a party or member of a party's household." There are no physical issues raised by either party. As stated, the evaluator noted some psychological concerns with both parties. First, he found that both had interpersonal dysfunction, which may in large part explain why the two of them are unable to have any collaboration, and why father is estranged from his daughter. Mother has some problems with dealing with stress, which the evaluator believes can be alleviated through counseling. While counseling may indeed be helpful, this court will leave it up to mother to address these concerns, not require them through this custody order. Finally, the evaluator found behavioral dysfunction in father's makeup. Based on the evidence, however, it appears that the finding that father has criminal propensities is overblown. Father's only criminal involvement concerned minor infractions when he was a juvenile. He appears to be a law-abiding citizen. Even when William Quinley caused problems for him, he handled the matter appropriately and within the law. Overall, the parties' dysfunction is relatively similar. This factor does not favor either party.

This court rules that mother shall retain primary physical custody. Although there is room for improvement, mother has performed adequately in her long-term status as primary custodian. She has provided continuity and stability. The minor child will continue to live in the home in which he is accustomed, have the same friends, and attend the same school district. With the problems he has at school, the continuation in the school district is particularly important. Hopefully, the IEP program administered by Daniel Boone will be sufficient for the

minor child's needs.

Father's level of stability and commitment to parenting remains in question. We see the potential for him laying a strong foundation, as it appears he is committed to his wife and his current employment. Hopefully, his two (2) separations from his wife, one because they were not getting along and the other being his trip to Florida, are things of the past.

Several issues need to be addressed. First is the relationship between mother and William Quinley. This court believes mother when she states that the relationship is over. If, however, she reunites with Mr. Quinley or becomes involved in another abusive relationship, the issue of primary custody should be revisited. Second, the parents must begin to cooperate to assist the minor child in his education. There appears to be several reasons for the minor child's difficulties, including his makeup and the weekday custodial schedule, but also due to failings of the parents, namely, mother's indulging the minor child when he does not want to go to school, mother's refusal to allow father to co-parent on educational issues, and father's acquiescence. This minor child has special needs, and the parents must put their differences aside.

This court agrees with mother that the weekday schedule must change. The minor child needs his rest more than he needs to spend overnight visits with father. Accordingly, the schedule shall be modified such that father will have every Friday evening overnight, a night when the minor child will not have to get up for school the next morning, and one (1) other evening a week, which the court will schedule for Tuesday, unless the parties wish to modify

the day. Further, father will be permitted to pick up the minor child as soon as he is free from his employment, whether from mother's home or directly from school. This court agrees with father that it serves no purpose to meet in Gibraltar for the transfer. Father shall be permitted to pick up the minor child at mother's house, unless the parties can agree to a different location directly between the parties' residences.

For the summer months, this court will order a shared 50/50 custody arrangement, on a week-on, week-off basis. This will enable the minor child to spend a significant time at father's house. Further, the schedule could be enhanced at some future time to provide father with the majority of the time during the summer months, if father continues to move toward long-term stability.

This court enters the following order:

## ORDER

And now, this 10th day of January 2014, after trial held, custody of the parties' minor child, D.S.M., born November 11, 2004, (hereinafter "minor child"), shall be as follows:

1. The parties shall share legal custody of the minor child.

2. During the school year, plaintiff, Lisa Ann Morris (hereinafter "mother"), shall have primary physical custody. Defendant, Arthur Layton Morris, Jr., (hereinafter "father"), shall have partial custody as follows:

(a) on alternate weekends from Friday at the conclusion of father's workday until Sunday at 6:00 p.m.,

(b) the Fridays prior to mother's weekend from the conclusion of father's workday until 10:00 a.m. on Saturday morning,

(c) one (1) evening per week, from the conclusion of father's workday until 8:00 p.m., the day of the week to be agreed upon by the parties, but in lieu thereof, to be Tuesday evenings, and

(d) at such other times as the parties may agree.

3. During the summer months, the parties shall share physical custody on a week-on, week-off basis, with the transfer time to be agreed upon by the parties, but upon failure to agree, every Friday at 6:00 p.m.

4. The provisions of paragraph 4 shall take precedence over any other provisions of this order for custody:

(a) The parties shall share their rights of partial custody and visitation on holidays as follows:

The parties agree to observe, at a minimum, the following holidays: New Year's Day, Easter Sunday, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Christmas Eve, and Christmas Day. With the exception of Thanksgiving, Christmas Eve, Christmas Day and Easter, the parties shall have partial custody of the minor child on holidays from 8:00 a.m. to 8:30 p.m. Father shall have custody of the minor child on New Year's Day and the parties shall alternate holidays accordingly thereafter.

The parties shall share custody of the minor child for the Thanksgiving, Christmas and Easter holidays as follows:

Thanksgiving: On Thanksgiving Day, mother shall have custody from 9:00 a.m. until 2:00 p.m. and father shall

have custody from 2:00 p.m. until 7:00 p.m.; Christmas: In odd-numbered years, mother shall have custody from 1:00 p.m. on December 24th until 1:00 p.m. on December 25th and father shall have custody from 1:00 p.m. on December 25th until 8:00 p.m. on December 26. In even-numbered years, father shall have custody from 1:00 p.m. on December 24th until 1:00 p.m. on December 25th and mother shall have custody from 1:00 p.m. on December 25th until 8:00 p.m. on December 26th.; Easter: On Easter Day, mother shall have custody from 9:00 a.m. until 2:00 p.m. and father shall have custody from 2:00 p.m. until 7:00 p.m.

(b) Mother shall have physical custody of the minor child on Mother's Day weekend and father shall have physical custody of the minor child on Father's Day weekend.

5. Each party shall have the right to custody of the minor child for purposes of summer vacation for two (2) non-consecutive weeks of uninterrupted custody. A party seeking vacation shall provide at least sixty (60) days written notice of the dates and times for said vacation. If the parties' proposed schedules conflict, father's vacation shall take precedence in odd-numbered years and mother's shall take precedence in even-numbered years.

6. The parties shall share transportation on a 50/50 basis, with father to pick up the minor child for his visits and mother to pick up the minor child to return the minor child to her home. The pick up shall be at the parties' respective residences, although father is permitted to pick up the minor child directly from school if his work schedule permits. The parties may agree to an alternate

arrangement where they meet at an agreed location between the two (2) residences.

7. Neither party shall remove the minor child from the United States of America without prior agreement of the other party or order of court. Consent shall not be unreasonably withheld.

8. The personal property of the minor child shall remain at the primary residence but mother shall send adequate clothes and other necessary supplies with father when father is exercising his rights of partial custody. Father agrees to return that personal property at the conclusion of his period of partial custody.

9. The parties shall agree to have the minor child tested for any possible allergies and to abide by the recommendation of the physician regarding any such allergies the minor child may have or may develop.

10. In addition to any provisions contained in this agreement regarding custody or partial custody, each party shall have the following rights with respect to the minor child: Reasonable telephone calling privileges, access to report cards and other relevant information concerning the progress of the minor child at school, information on upcoming school activities, approval of any extraordinary medical or dental treatment, except in the case of an emergency, provided that such approval shall not be unreasonably withheld. Each party will inform the other of all visits to a physician or dentist by the minor child. Each party shall have the right to obtain necessary medical information directly from the minor child's school and medical practitioner. Each party shall approve summer camps and schools, provided that such approval shall not

be unreasonably withheld.

11. In all matters of importance relating to the minor child's health, education, and welfare, the parties shall confer with each other for the purpose of developing a harmonious policy calculated to promote the minor child's best interest. This duty shall include the requirement that the parties discuss with each other all important events in the minor child's life, including, but not limited to, selection of schools, school meetings, day care facilities, travel plans, medical conditions, education progress plans, extracurricular activities, and vacation plans.

12. The parties shall make arrangements with the minor child's school so that each party will receive duplicate notices of school activities, parent-teacher meetings, and sports events. To the extent possible, the parents shall notify each other of any social engagements of the minor child which parents normally attend in sufficient time to allow the other parent to attend.

13. Father and mother shall have the right to make major parenting decisions affecting the minor child's health, education, and welfare. The parties intend that they both shall continue to be fully involved in all matters of importance in the minor child's life, including, but not limited to, the following:

(a) Decisions which affect the minor child's general physical health and welfare;

(b) Decisions which involve the minor child's medical or dental needs or mental health treatment;

(c) Decisions which will affect the minor child's educational learning process experience, especially as

it relates to choice of school or curriculum or athletic programs;

(d) Decisions with regard to the minor child's extracurricular activities and pursuits;

(e) Conferences scheduled to review the minor child's progress at school, including the exchange of report cards and grades; and

(f) Such other matters which may come to the attention of either parent and which, in that parent's opinion, considering the best interest of the minor child, deserves mutual consideration and communication.

14. Failure by either party to insist on strict compliance with any of the foregoing provisions of this agreement relating to custody/partial custody shall not be construed to be a waiver or modification of those provisions.

15. Each party shall encourage and promote the minor child's relationship with the other party. The parties shall not disparage, downgrade, insult, or otherwise speak negatively about the other party or the other party's immediate family in the presence of the minor child, nor permit other individuals to do so and each party will endeavor to encourage the development of the parent-child relationship between the minor child and each parent. Neither party shall alienate or permit to attempt to alienate the minor child from the other party.

16. In the event of any serious illness of the minor child at any time, any party then having custody or partial custody of the minor child shall immediately communicate with the other party by telephone or any other means available. The other party shall be informed of the nature

of the illness. Each party shall notify the other party prior to making any major medical decision of a non-emergency nature. The term "serious illness" as used herein shall mean any disability which confines the minor child to bed under the direction of a licensed physician for a period in excess of forty-eight (48) hours. During such illness, each party shall have the right to visit the minor child as he or she desires consistent with the proper medical care of the minor child.

17. This agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania. The situs of this agreement shall be Berks County, Pennsylvania.

18. Neither party shall permit the minor child to have any contact with William Quinley.

19. The parties shall engage in co-parenting counseling, with the parties to share the costs equally. The co-parenting counselors shall be chosen by counsel for the parties and if counsel is unable to agree, the court shall appoint the counselor. The counseling shall continue until the counselor no longer deems it necessary or until further order of court.

20. This order shall be considered a final order finally resolving the issues raised in the petition of mother for a modification of a custody order and the corresponding counterclaim filed by father.

21. If either party is planning to relocate with the child and the relocation will significantly impair any other party's exercise of custodial rights, the relocating party is obligated to provide a detailed notice and counter-

affidavit by certified mail, return receipt requested, to all individuals who have custody rights to the child at least sixty (60) days in advance of the proposed relocation in compliance with 23 Pa. C.S.A. Section 5337.

22. The attached appendix shall be made a part of the within order.

## APPENDIX TO CUSTODY ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on all parties. Violation of any of these rules could become the subject of contempt proceedings before this court, or could be grounds for modification of this order. The word "child" is used below, but these rules apply to all the children in the order. If any of these general rules conflict with any specific provisions of the order, the order shall control.

1. In addition to the rights in the order, all parties shall also have the following rights with respect to the child:

A. The right to reasonable telephone contact with the child when they are in the other party's custody.

B. The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain information directly from the child's school or medical practitioner.

C. The right to be informed in advance before any important decision is made concerning the child and the opportunity to participate in those decisions.

2. In the event of any serious illness of the child at any time, the party then having custody of the child

shall immediately communicate with the other parties by telephone or by any other means, informing the other parties as to the nature of such illness. During such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

3. None of the parties shall alienate or permit an attempt by anyone else to alienate the child from the other parties. While in the presence of the child, none of the parties shall make any remarks or do anything which is derogatory or uncomplimentary to the other parties and it shall be the duty of each party to uphold the other parties as ones the child should respect and love.

4. Both parties shall provide each other with the addresses and telephone numbers of where they will be staying anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three (3) days.

5. The parties shall not conduct arguments or heated conversation in the presence of the child or when the child can overhear the argument.

6. The parties shall at all times consider the child's best interests, and act accordingly. It is in a child's best interest for the parties to understand that the child is trying desperately to cope with the fact of his or her parents' separation, and needs help in loving both parents and any other involved parties.

7. Neither party shall question the child as to the personal life of any other party except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on any other party.

It is harmful to a child to be put in the role of spy.

8. The parties should remember that they cannot teach the child proper moral conduct if that party is indulging in improper conduct. Children are quick to recognize hypocrisy, and the party who maintains a double standard will lose the respect of the child.

9. Weekend and evening custody shall be subject to the following general rules:

A. Arrangements should be worked out beforehand between the parties without forcing the child to make choices and run the risk of displeasure. However, the child shall be consulted as to their schedules when appropriate.

B. Custodial rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other parties and to the needs and desires of the child.

C. If a party finds himself or herself unable to pick up or drop off the child at the designated or agreed to time, he or she should give immediate notice to the other parties to avoid subjecting the child to unnecessary worry or failed expectations.

D. The party having custody of the child should prepare them both physically and mentally for the transfer of custody to another party and should have them available at the time and place designated in the order or mutually agreed upon.

E. If any party or the child has plans which conflict with their scheduled custodial time and they wish

to change their custodial time, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and the parties should be flexible for the sake of the child.

F. If a party shows up to begin their custodial time with the child and the party is under the influence of alcohol or drugs, the custodial time may be considered forfeited on those grounds alone.

10. If any party feels that another party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.